IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 8:07CR30 |
| vs. | ) | |
| | ) | REPORT AND |
| JAISANKAR MARIMUTHU, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the defendant's Motion to Suppress Statements (Doc. 177), which was submitted on the parties' briefs and evidentiary materials, without hearing. The matter was deemed submitted on October 2, 2009 upon the filing of the government's response and evidence index (Docs. 185 & 186).

## FACTUAL BACKGROUND

The record shows that the defendant Marimuthu was arrested by the Hong Kong police on December 19, 2006. He was interviewed by two Hong Kong police constables on December 20 and December 21, 2006 (Doc. 186, Exs. 2 & 4).

**A. December 20, 2006 Interview**

The December 20, 2006 interview was conducted in the presence of the defendant's legal representative, and an English-Tamil interpreter was provided. Marimuthu acknowledged that he read and understood the rights advisory provided on the written charging document (Doc. 186, Ex. 1), i.e., that he was not obliged to say anything unless he wished to do so, but whatever he did say would be taken down in writing and may be given in evidence. (Doc. 186, Ex. 2 at p. 12/195, line 66). He gave his consent for the interview to be video recorded. (Doc. 186, Ex. 2 at p. 13/195, lines 78-82). Marimuthu stated he felt well enough to go through with the interview. He said he had not

eaten since his flight from Bangkok the previous morning and was offered supper, but he preferred to finish the interview before eating. (Doc. 186, Ex. 2 at p. 18-21/195). Marimuthu was advised that he was suspected because his bank account number was involved in on-line stock trades. After being given an explanation of the charges, Marimuthu was orally advised that he was not obliged to say anything unless he wished to do so, but what he said may be recorded and given in evidence. Marimuthu agreed to talk. (Doc. 186, Ex. 2 at p. 28/195, line 207). He provided biographical information and advised that he held a degree in advanced physics or aerodynamics. In 1996 he became engaged in the business of designing, producing and distributing small machinery and parts. His business was located in Chennai, India. He stated that he could operate a computer but was not a professional. (Ex. 186, Ex. 2 at p. 45/195). Marimuthu told the constables that he had investment accounts in Hong Kong at Hang Seng Bank and Hongkong Bank, which he had opened within the past 18 months. There was a discussion as to whether Marimuthu used internet banking with these accounts. He said had made two or three share trading transactions on his own when he opened the account, but lost money and stopped. (Doc. 186, Ex. 2 at pp. 80-85/195 ). Marimuthu said he had been making investments for three or four years, but only at the advice of his bank manager. (Doc. 186, Ex. 2 at pp. 86-87). He stated that during the prior month he had allowed one "Abdullah" access to his Hong Kong account. "Abdullah," who represented himself as a chartered accountant, had advised him to buy certain shares in October 2006. Marimuthu was supposed to pay Abdullah 50% of the profit. (Doc. 186, Ex. 2 at pp. 105-108/195). Apparently, the transactions were made online from an internet café or coffee shop by Abdullah using Marimuthu's account. The profits were then transferred from Marimuthu's account in Hong Kong to his account in Bangkok via internet from a location in India. Some time thereafter Marimuthu tried to use a debit card and

discovered that his bank account had been blocked. The bank officers advised him that he would have to come to Hong Kong to sort it out. He decided to go to Hong Kong because there was still around $300,000 in the account.

Marimuthu stated that a USB thumb-drive seized from him when he was arrested was not his. (Doc. 186, Ex. 2 at p. 155/198). He identified other items, including his wallet and bank ATM transaction slips, the key to his luggage, his friend's mobile phone, a number of bank cards, money, SIM cards, and items or records belonging to his childhood friend, ChockalingamRamanathan. (Doc. 186, Ex. 2 at p. 178/195). Marimuthu stated he had a money-market security account with e-Trade for the NASDAQ stock market. He had discussed the "Abdullah" matter with ChockalingamRamanathan. The interview started at 7: 21 PM and concluded at 8:41 PM.

### B. December 21, 2006 Interview

The December 21, 2006 interview was also conducted in the presence of Marimuthu's legal representative and using an English-Tamil interpreter. The interview started at 1:54 PM and ended at 2:53 PM. Defendant Marimuthu was once again advised that this was a continuation of the previous interview, and they were enquiring about using the internet with criminal intent in October 2006. Specifically, that there were four accounts being illegally used to do a stock trade, resulting in a total loss of about $3.5 million Hong Kong dollars. Marimuthu was cautioned that he was not obliged to say anything unless he wished to do so, but whatever he said would be recorded and given in evidence. He said he understood. (Doc. 186, Ex. 4 at pp. 4-19/155). In response to the constable's question, Marimuthu stated that he was in the process of trying to set up a business in Thailand, by March 2007, with respect to lathe machinery imports and exports and hospital automations (Doc. 186, Ex. 4 at pp. 20-23/155).

A customs invoice seized from the defendant indicated that he had purchased a card-reader from a supplier in China. Marimuthu indicated that the card-reader was like a key card for use in hospitals and explained that he wanted to produce or sell his own card-reader product. The card-reader was still in India. The name of his company was Caliber Plus, and the company was registered in his home state of Tamil Nadu, India. (Doc. 186, Ex. 4 at pp. 21-32/155). The company was not listed in the stock market, *id.* at p. 34/155, and had a Yahoo e-mail account, *id.* at 35-37/155. His secretary, accountant, and inventory master knew the password to this e-mail account.

Marimuthu explained that he had no name-card with him bearing his own name because he had traveled from India, through Bangkok, to Hong Kong, and the airline would not check in his second suitcase. He left the second suitcase back in Chennai, India and the people who dropped him off at the airport took it back home. He stated that he did not have any business partners, but identified two electronics customers located in India. He was trying to get some overseas business partners, did have some clients in Thailand, and identified three individuals as agents based in India and Thailand.

Marimuthu stated he had no business establishment in Hong Kong, and this was his fourth trip to Hong Kong. He came to Hong Kong because of the problem with his HSBC account and the bank said he had to come to Hong Kong to sort it out. (Doc. 186, Ex. 4 at p. 58/155). He came in person because he was "very innocent," *id.* at p. 60/155, and the $300,000 in the HSBC account was a significant amount of money in India.

He opened the Hang Seng Bank and HSBC accounts because there were a lot of suppliers in Shenzhen, China which have agents' offices in Hong Kong. He also had HSBC and Hongkong Bank accounts in India. He was trying to establish business contacts and get a good supplier from

Shenzhen. Hang Seng Bank is a part of HSBC. He said he had spoken with at least 15 or 20 suppliers listed in the Shenzhen business directory, but had not contacted anyone recently. The suppliers all had Chinese names, which he could not remember. (Doc. 186, Ex. 4 at pp. 61-66/155). Marimuthu told the constables he did not know he could open an HSBC bank account from an overseas country. Id. at p. 67/155.

The property seized from Marimuthu at the time of his arrest included several flight tickets or boarding passes, and he was asked about his flights on October 22 and 26, 2006. He had traveled from India to Bangkok on October 26, 2006 and from Bangkok to India on October 22, 2006. His investment account records indicated that he made an investment on October 18, 2006. He had met "the man" one day earlier in Thailand and made stock trades in two or three browsing centers or internet cafés in Bangkok. "The man," who was also a citizen of India, was somewhere in Bangkok, but was in touch with Marimuthu over the phone when the stock trades were made. They did not travel together, but both returned to India so that Marimuthu could pay him the money. He did not do any stock trades while he was in India; however, Abdullah had the key to his account.

Marimuthu indicated that for the past three to four years, his company had made a profit of around two to three million Indian rupees. The constable pointed out that between October 18 and 24, 2006, he made almost HK$650,000 with his HSBC account. Marimuthu did not agree that this was "easy money," because he did not have Abdullah's knowledge of the stock market. If he did it himself, there was no chance he would make that much money. He "blindly" believed Abdullah on the very first day; he made a profit. That is why Marimuthu gave Abdullah access to his account, and they made a deal to split the profit evenly. (Doc. 186-5, Ex. 4 at p. 97/155). Marimuthu likened the arrangement to a portfolio management service.

Marimuthu could not explain why the activity on this account stopped after October 23, 2006, because Abdullah was controlling the account. Around that time, he was in a rush to repay Abdullah. He traveled to India, paid Abdullah, and returned to Thailand, where he learned that his account had been locked. He called Abdullah, who said he was going to call back in a couple minutes. "After that, no, nothing." Marimuthu stated that he paid Abdullah in cash and did not suspect anything was wrong until the account was locked and he lost contact with Abdullah. (Doc. 186, Ex. 4 at pp. 100-107/155). He indicated that all of his prior investments, including investments in penny stocks, were done based on recommendations from his advisers at Deutsche Bank. *Id.* at pp. 112-130/155). He allowed Abdullah access to his account after an acquaintance of one day because he was impressed by Abdullah's appearance and manners.

At the conclusion of the interview, Marimuthu stated that with respect to this case, he was really innocent and had been fooled by Abdullah. If he was guilty, he would not have come to Hong Kong. He offered to repay any losses and said he did not want to have any fraudulent money. (Doc. 186, Ex. 4 at pp. 149-151/155).

## LEGAL ANALYSIS

"The general rule is that evidence obtained from searches carried out by foreign officials in their own countries is admissible in United States courts, even if the search would not otherwise comply with United States law or the law of the foreign country." *United States v. Emmanuel*, 565 F.3d 1324, 1330 (11th Cir. 2009). There are two narrow exceptions to this rule. First, evidence from foreign searches is inadmissible if the conduct of the foreign officials during the search "shocks the judicial conscience." Second, evidence obtained from foreign searches is subject to the exclusionary rule pursuant to the Fourth Amendment "if American law enforcement officials substantially

participated in the search or if the foreign officials conducting the search were actually acting as agents for their American counterparts." *Id.*

> A defendant may move to suppress statements made to agents of foreign governments when the conduct of foreign law enforcement officials renders them agents, or virtual agents, of United States officials. *See United States v. Maturo,* 982 F.2d 57, 61 (2d Cir.1992). For example, "statements elicited during overseas interrogation by foreign police in the absence of *Miranda* warnings must be suppressed whenever United States law enforcement agents actively participate in questioning conducted by foreign authorities." [*United States v. Yousef,* 327 F.3d 56, 145 (2d Cir. 2003)]; *see also United States v. Bagaric,* 706 F.2d 42, 69 (2d Cir.), *cert. denied,* 464 U.S. 840 (1983); *United States v. Bin Laden,* 132 F. Supp. 2d 168, 187 (S.D.N.Y. 2001). Suppression is also required when United States officials, "despite asking no questions directly, used the foreign officials as their interrogational agents in order to circumvent the requirements of *Miranda.*" *Bin Laden,* 132 F. Supp. 2d at 187; *see also Yousef,* 327 F.3d at 146; *Maturo,* 982 F.2d at 61.

*United States v. Karake*, 281 F. Supp. 2d 302, 308-309 (D.D.C. 2003)[1]. *See also United States v. Martindale*, 790 F.2d 1129 (4th Cir. 1986), *cert. denied*, 479 U.S. 855 (1986); *United States v. Delaema*, 583 F. Supp. 2d 104 (D.D.C. 2008). The Eighth Circuit applied this rule in *United States v. Bean*, 138 Fed. Appx. 886, 887, 2005 WL 1645457 at *1, No. 04-2141 (8th Cir., July 14, 2005), finding that the district court properly denied the defendant's motion to suppress a firearm upon finding that the firearm was seized by Canadian police who did not act as agents of the United States and whose conduct was not conscience-shocking. (Citing *United States v. Delaplane*, 778 F.2d 570, 573 (10th Cir. 1985), *cert. denied*, 479 U.S. 827 (1986)).

---

[1] In the *Karake* matter, the district court held a five-week evidentiary hearing and held that the statements given by the defendants to Rwandan and American interrogators starting in December 2001 were the product of torture and coercion and were, therefore, inadmissible. *United States v. Karake*, 443 F. Supp. 2d 8 (D.D.C. 2006).

In this case, the record does not support the conclusion that the two interviews at issue were the result of a "joint venture" with the United States or that the Hong Kong authorities acted as agents of the United States.

Turning to the issue of voluntariness, "the 'shocks the judicial conscience' standard is meant to protect against conduct that violates fundamental international norms of decency." *United States v. Emmanuel*, 545 F.3d at 1331. The court has not detected a scintilla of evidence in this record that could arguably "shock the judicial conscience." There is absolutely no indication that the defendant's statements were obtained by Hong Kong authorities by means of coercion or duress.

## RECOMMENDATION

**IT IS RECOMMENDED** that the Motion to Suppress Statements (Doc. 177) be denied; however, if the district court determines that an evidentiary hearing should be held, it is further recommended that the hearing be held immediately prior to trial due to the necessity of securing witnesses from Hong Kong.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing an "Objection to Magistrate Judge's Recommendation" within ten (10) business days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED November 2, 2009.**

BY THE COURT:

s/ F.A. Gossett
**United States Magistrate Judge**